IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAWN BISHOP, et al.,

       Plaintiffs,

                                 Case No. 2:08-cv-615
-vs-                          JUDGE GREGORY L. FROST
                                 Magistrate Judge Mark R. Abel

OHIO DEPARTMENT OF
REHABILITATION AND CORRECTIONS,

       Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Ohio Department of Rehabilitation and Corrections' Motion for Summary Judgment ("Defendant's Motion for Summary Judgment") (Doc. # 45), Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. # 46), Defendant's Reply Memorandum in Support of Defendant's Motion for Summary Judgment (Doc. # 47), Plaintiffs' Notice of Filing of Corrected Page (Doc. # 48), and Defendant's Response to Plaintiff's Sur-Reply Memorandum Captioned "Notice of Filing of Corrected Page" (Doc. # 49). For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment.

### I. Background

Plaintiffs Dawn Bishop, Cheri Gause, Denise Marsh, and Brandi Henry were employed by the Ohio Department of Rehabilitation and Corrections ("Defendant" or "ODRC") as corrections officers at the London Correctional Institution ("LCI") in Madison County, Ohio. LCI is classified by ODRC as a level one minimum security and a level two medium security

institution that houses approximately 2,600 inmates.  LCI has 12 dormitories that house

approximately 200 inmates each.  Additionally, outside the perimeter fence there is a 3,000 acre

farm that contains farm outbuildings as well as an honorary inmate dormitory.

Deborah Timmerman-Cooper has been the warden at LCI from 2003 until the present.

Prior to becoming warden, Timmerman-Cooper received numerous promotions over her 27 year

career with ODRC and is the highest ranking official at LCI.  As warden, Timmerman-Cooper is

the appointing authority and ultimate decision maker with regard to disciplinary action taken

against LCI employees.  The warden is assisted by three deputy wardens and a major.  The major

supervises captains, who are scheduled two per shift.  The captains act as the shift commanders

and are responsible for the operation of the facility during that shift.  Captains are assisted by

lieutenants who directly supervise the corrections officers.  Corrections officers are responsible

for securing and maintaining control of the institution by enforcing departmental rules and

regulations.

Upon hire, corrections officers must attend a three or four week training course at the

Corrections Training Academy followed by three weeks of on the job training at the institution

in which they will work.  Corrections officers are members of a bargaining unit represented by

the Ohio Civil Service Employees Association, AFSCME Local 11, AFL-CIO.  Pursuant to the

Collective Bargaining Agreement a newly hired corrections officer is subject to a 365 day

probationary period that allows supervisors to observe his or her performance.  During this

period the employee is treated as an at-will employee, who may be terminated without just cause.

After completing the probationary period corrections officers gain rights to grieve discipline and

to have a union steward present during investigatory interviews that may lead to discipline or to

a pre-disciplinary hearing. Although probationary employees are not entitled to these rights, the practice at LCI is to allow them access to steward representation when discipline may result.

One procedure in which LCI staff engages is referred to as a security challenge. A security challenge is a procedure whereby supervisors ensure that institutional policies and procedures are followed. For example, a supervisor may remove a key from a post and place it in a captain's office. If the corrections officer is alert, he or she will notice and report the missing key. Corrections officers are not disciplined for failing a security challenge.

Plaintiff Marsh began working at LCI in January 2004 and passed probation in January 2005. Plaintiff Gause began working at ODRC, Toledo Correctional Institution in October 2000. She transferred to LCI in August 2004, after her probationary period had ended. Plaintiff Bishop and Plaintiff Henry both began working at LCI in January 2005 and were on probation throughout their employment.

In 2005, Plaintiffs were assigned to the third shift, working from 9:50 p.m. to 6:00 a.m. There were three supervisors assigned to the third shift, one of which was Lieutenant Yvonne Richardson. Lt. Richardson has been employed with ODRC for the approximately 16 years. She started her career as a corrections officer and was promoted to lieutenant approximately five to six years later. Lt. Richardson was the only female lieutenant at LCI and was assigned to the third shift in 2005.

Bishop, Gause and Marsh filed the complaint in this action on June 25, 2008. An amended complaint adding Henry as a plaintiff was filed November 21, 2008. Plaintiffs allege gender discrimination hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## II.  Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "there is no genuine issue as to any material fact . . . ."  Fed. R. Civ. P. 56(c).  In making this determination, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party.  *Id.* at 255.

## III.  Analysis

Plaintiffs claim they were subjected, by their supervisor Lt. Richardson and by their coworkers, to a hostile work environment on the basis of gender.  Plaintiffs also assert that Bishop and Henry were terminated, Marsh and Gause were constructively discharged, and all four plaintiffs were subjected to a hostile work environment, in retaliation for opposing practices which they reasonably perceived to be discriminatory on the basis of gender.

### A.  Gender Based Hostile Work Environment

Plaintiffs claim they were subjected to a hostile working environment based upon their gender by (1) Lt. Richardson's discriminating against women in post assignments, (2) Lt. Richardson's other harassing conduct, and (3) some of their male coworkers' harassing conduct.

#### 1.  Lt. Richardson's unfair scheduling

During Plaintiffs' employment at LCI, third shift employed 17 correctional officers, 5 of

whom were female. The third shift posts consisted of 12 in the dormitories, 4 in the yard, 3 in segregation, 2 in the control center, 2 on the perimeter, 1 in the medical treatment building, 1 in the dining room/kitchen, 1 at the entry, 1 front keys post, 1 farm patrol, and 1 at the honor camp dormitory control center. Plaintiffs claim that Lt. Richardson gave preference to male employees when scheduling post assignments. Plaintiffs specifically testified that they believed the women corrections officers were scheduled disproportionately to the dormitory posts, that many believed to be less desirable than other posts, and that the female officers were assigned to outside posts during inclement weather more than were there male coworkers. Plaintiffs also generally believed that Lt. Richardson favored African American male officers over white male officers.

An investigation by ODRC as a result of Plaintiffs' complaints determined that on the third shift female officers were placed in dormitory assignments 55% of the time as opposed to 43% of the time for male officers; were scheduled in yard assignments 12% of the time compared to 24 % of the time for males; were placed in the front keys position 1% as opposed to 2% male placement; and, were scheduled 1% of the time on farm patrol as compared to 3% of the time for the male correction officers. Lt. Richardson denies that she showed favoritism to male officers and testified that she preferred to have "seasoned officers" working farm patrol, control center, front keys, and yard patrol. (Richardson Dep. at 17, 19).

### 2. Lt. Richardson's other harassing conduct

The Court will review the evidence related to each of the plaintiff's complaints about Lt. Richardson's conduct.

### a. Plaintiff Henry

Plaintiff Henry testified that she was told by a male corrections officer that Lt.

Richardson "didn't like females." (Henry Dep. at 64-65.) Henry testified that Lt. Richardson:

> Would be sitting there laughing and joking with the males. If a female would --
> like in roll call a female would walk up there, she would start glaring. It was
> always -- seemed real hateful, and she was always really short with females. As
> soon as one of the males would come up there, her whole attitude would change.

*Id.* at 74.

Approximately eight or nine months after she started working at LCI, Henry began to hear rumors that Lt. Richardson was trying to get her fired. Henry testified that she confronted Lt. Richardson about this rumor and Richardson told Henry that she could not trust her fellow corrections officers because "everything comes back to her." *Id.* at 66-67. Henry testified that Lt. Richardson said to her, "I don't like you, I don't have to like you" and on a later occasion reminded her again she did not like her. *Id.* at 65-66, 70-73. Henry complained to Captain Thomas Hampton about the comment but that he "laughed it off." *Id.* at 72.

Henry testified that on one occasion a dormitory sergeant assigned two inmates to laundry duty during third shift and that during that night Lt. Richardson came into the dormitory and in front of the inmates asked Henry "what the hell both of them were doing up." *Id.* at 68-69. On another occasion Lt. Richardson asked Henry "who's the officer in this dorm?" *Id.* at 69. On another occasion, Lt. Richardson "started screaming at me for not being in the dorm, told me to get my ass to the fucking dorm." *Id.* at 78. On another occasion in during the summer 2005, Henry was working as the yard officer and was escorting an inmate when the inmate called her "his woman." *Id.* at 83. Henry reported this event to Lt. Richardson and wrote an incident report. Henry testified that Lt. Richardson stated that the incident report conflicted with Henry's original story she had reported so Richardson planned to testify on behalf of the inmate at the rules infraction board hearing. Henry spoke with Captain Hampton about the incident and asked

what part of her written report was in conflict with her verbal report, but does not recall how he responded. Henry is unsure whether Lt. Richardson testified on behalf of the inmate.

Henry testified that on two occasions Lt. Richardson entered the dormitory in which Henry was working through one door and left through a different door, leaving the first door unlocked and "propped" open. *Id.* at 88, 114. Henry found the door unlocked and reported it in her log book on the advice of a union representative. Henry was trained to write incident reports about security breaches, but she chose not to on this occasion because she caught these two events quickly and believed that if a breach is caught quickly it is not serious enough to warrant an incident report. Lt. Richardson testified that she does not recall either of these incidents. Lt. Richardson testified that she believes leaving the door to a dormitory open is a legitimate security challenge. Lieutenant Robert Joy disagrees with this determination.

### b. Plaintiff Gause

When Gause transferred to LCI in August 2004, her last name was McKethan. Gause testified that from the beginning the "overall demeanor of Lt. Richardson was negative toward females[,]" that she "basically had dismissed us, wouldn't acknowledge us[,]" and "would glare at us." (Gause Dep. at 44.) Gause testified that Lt. Richardson refused to call Gause by her proper last name and speculates that was because she is white and is married to a black man.

Gause testified that between August and October 2005, Lt. Richardson twice hung up the telephone before their conversation was complete, snatched documents out of Gause's hand, and did not accept paperwork from Gause, claiming that it was illegible even though Gause does not believe Richardson looked at it. Gause complains that Lt. Richardson would laugh and carry on with men, but that she would disregard females. On one occasion Lt. Richardson "exploded" at

her for being by the vending machines, while only telling a male officer who was also at the vending machine to stay at his post as an afterthought.

In late January 2005, Gause began a relationship with her current husband, Lieutenant Steven Gause, who was also employed at LCI.  Lt. Richardson asked Gause questions about the relationship, told her that Richardson and Lt. Steven Gause were also dating, that Lt. Steven Gause "slept with" Lt. Richardson and "somebody at a gas station" prior to dating Gause, and screamed at Gause that she should "go to a doctor" and that Lt. Steven Gause "was a snake."  *Id.* at 85-87.  Rumors spread at LCI that Lt. Richardson was unhappy because Gause was dating Lt. Steven Gause.

Gause requested a demotion to a Health Information Technician ("HIT") position in a different department so that she would be away from Lt. Richardson.  Gause testified that the harassment continued when she moved to the HIT position and in November 2007, she took disability retirement.  Gause contends that her retirement was actually a constructive discharge.

### c.  Plaintiff Marsh

Marsh testified that she believes that Lt. Richardson opened an envelope addressed to Marsh from Warden Timmerman-Cooper because the envelope was taped shut when Richardson gave it to Marsh.  Marsh reported the incident.  Marsh was summoned to a meeting with Captain Hampton and Lt. Richardson in which Richardson told Marsh that she did not want to be "put on paper" again.  Marsh reported this incident because she was embarrassed in front of Captain Hampton and because other officers laughed at her about the meeting.

On one occasion Marsh asked a male coworker a question about her post assignment for a post she had never worked before and he replied, "if you don't know your job, you don't need

to be here." (Marsh Dep. at 80-81).  Lt. Richardson then stated to that male coworker that it was up to him if he wanted to "baby-sit" Marsh, but that Richardson would not.  *Id.*

In June 2005 Marsh requested a transfer to the correctional facility in Toledo, Ohio so that she would no longer be required to work with Richardson.

### d.  Plaintiff Bishop

Bishop testified Lt. Richardson did not speak disrespectfully to her or belittle her, stating that "it was a form of disrespect asking me personal questions, but talking down to, that part did not happen to me."  (Bishop Dep. I at 90.)  Bishop also does not recall Lt. Richardson speaking disrespectfully or with hostility to others.  Bishop does believe that Lt. Richardson was friendlier with males than she was with females, testifying that Richardson did not "kick it" with the female officers but spent "time getting to know male officers, talking, laughing, joking around." *Id.* at 180.

With regard to the personal questions to which Bishop referred, Lt. Richardson informed Bishop that Richardson was unable to reach Bishop by telephone and asked Bishop for her home telephone number.  Bishop testified that she does not believe Lt. Richardson's stated purpose for requesting the home telephone number because ODRC had been given Bishop's cellular telephone number and the telephone number of a relative and Bishop did not receive a message at either of these two numbers.  Bishop thinks that Lt. Richardson was in contact with Bishop's ex-boyfriend because during an argument he told Bishop that he knew she was not "going to make probation," *i.e.*, retain her employment at LCI after her probationary period.

On July 15, 2005, Bishop was scheduled to attend an in-service training at 7:30 am.  She arrived to the meeting two minutes late and was given a written reprimand as a result.  Bishop

testified that a male probationary corrections officer was not disciplined at all when he failed to attend an in-service training.

### 3. Male coworkers' harassing conduct

Plaintiffs also claim that their male coworkers subjected them to a hostile work environment based upon gender.  Specifically, Henry and Gause testified that unknown male officers made baby crying sounds towards them, and that on at least two occasions they heard a male corrections officer say "quit your bitching" when the women were scheduled to an outside shift during bad weather.  (Henry Dep. at 158-160; Gause Dep. at 175.)

Marsh testified that one of her male coworkers was "very hateful toward women and that when she complained about "something I felt wronged on" he would say, "Quit crying, you know.  We don't want to hear it."  (Marsh Dep. 77-78).  Additionally, when Marsh complained about her post assignments, the male coworker said "Oh, get over it."  *Id.*  This male coworker had "something smart to say" about four times a week and that one night he made a comment in front of Lt. Richardson.  *Id.* at 77-79.

Henry, Gause, and Marsh all three testified that one of their male coworkers, Gregory Davis, often referred to himself as the "golden child" and that he did so at times in front of Lt. Richardson.  Plaintiffs claim that Lt. Richardson and Davis were good friends.  Gause believed that Davis was permitted to come to roll call late every day and that he would watch movies or sleep during working hours.  Marsh testified that Davis stated that the women officers would "be in the yard tonight because it's raining" and "women don't belong here.  Women need to be home in the kitchen."  *Id.* at 74, 75.  Gause and Marsh believe that on one occasion Davis followed them home from work.

### 4. Hostile work environment legal analysis

The touchstone of a hostile work environment claim is proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). There is both a subjective and an objective prong to this standard. In other words, "the [objectionable] conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) (citing *Harris*, 510 U.S. at 21-23). There appears to be no question that Plaintiffs believed that their work environment was hostile or abusive. Consequently, the question before the Court is whether a reasonable person would have found it to be that way.

In answering this question, the Court looks at various factors including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) (hostile work environment doctrine). Although the work environment as a whole must be viewed by the Court, including all alleged acts of harassment or abuse, if such acts are irregular and sporadic rather than continuous and frequent, it is much more difficult for the victim to prove a hostile work environment claim. *See id.* "Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

In the instant action, even when construing the evidence in a light most favorable to Plaintiffs, the Court easily concludes that conduct complained of does not rise to the level of actionable gender based hostile work environment. The evidence before the Court with regard to Lt. Richardson indicates that she subjected women to marginally unfair scheduling, laughed and joked with male corrections officers but ignored, stared at, or rolled her eyes at females, yelled at female officers on occasion about where they were located, and occasionally used profane language.

Regarding Plaintiffs' male coworkers, the evidence shows that some of them made baby crying sounds towards them, at least twice said "quit your bitching," did not socialize much with Plaintiffs, and made comments about the women being required to work outside in bad weather. Davis, on one occasion, made a comment about women not being qualified to work as corrections officers.

While this evidence shows that Lt. Richardson was not the most civil person with whom to work or for whom to work, and it also suggests that Defendant's employees did not always conduct themselves in a professional manner, Title VII is simply not a general civility code. *See Faragher*, 524 U.S. at 788 ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' "). *See also Zaring Homes*, 104 F.3d at 826 (Title VII was simply "not designed to purge the workplace of vulgarity") (citing *Baskerville v. Culligan Internat'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

The work environment about which Plaintiffs complain is a far cry from the environments that the Sixth Circuit has found to rise to the level of actionable gender based hostile work environment. For example, in the most recent published hostile work environment case the Sixth Circuit, in reversing the district court's grant of summary judgment to the defendant employer, found that the following was sufficient to go to trial: The plaintiff "was repeatedly called a 'bitch' by a co-worker in anger, was referred to by another as a 'heifer' with 'milking udders,' and was taunted by a male co-worker wearing nothing but a towel around his waist when she was the only female in the office." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271-71 (6th Cir. 2009). Also, the "commonplace offensive occurrences" about which the plaintiff complained were her coworkers' "vulgar descriptions of female customers, associates and even friends as 'bitches,' 'whores,' 'sluts,' 'dykes,' and 'cunts;' co-workers' joint ogling and discussions of obscene photographs and pornographic magazines; and co-workers' explicit conversations about their own sexual practices and strip club exploits." *Id.* at 271. Indeed, the conduct about which Plaintiffs complain can be comfortably categorized as simple teasing, offhand comments, and isolated incidents, which is not actionable conduct under Title VII.

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as it relates to Plaintiffs' gender based hostile work environment claims.

**B. Retaliatory Hostile Work Environment**

In October, 2005, Plaintiffs and three other female corrections officers sent a letter to Warden Timmerman-Cooper complaining about what they perceived as discriminatory scheduling by Lt. Richardson. On October 17, 2005, Warden Timmerman-Cooper's office

received the letter of complaint. The warden discussed the complaint with Major Bill Kelley and other supervisors not assigned to third shift and determined that the complaint should be investigated. Warden Timmerman-Cooper assigned the investigation to unit manager Kelly Mason on November 7, 2005.

Plaintiffs contend that in retaliation for this complaint they were subjected to a retaliatory hostile working environment, that Marsh was transferred, that Gause was demoted and then constructively discharged, and that Bishop and Henry were terminated. In a case like this, where the plaintiffs do not have direct evidence retaliation, they must rely upon the burden shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to create an inference of retaliation.

Under this burden shifting analysis, a plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (modifying standard to provide for not only adverse action retaliation but also retaliatory harassment by a supervisor). *See also Hawkins v. Anheuser-Busch,, Inc.*, 517 F.3d 321 (6th Cir. 2008) (extending cause of action to coworker retaliation).

If a plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its actions."

*McDonnell Douglas Corp.*, 411 U.S. at 802. The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate "that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 256.

### 1. Prima facie case of retaliation

In the instant action, there is no dispute that the Plaintiffs' letter complaining of gender discrimination constitutes protected activity under Title VII. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989). The parties dispute whether Plaintiffs have established the remaining elements of their prima facie case.

### a. Prong 2 - Did Defendant possess knowledge of Plaintiffs' protected activity?

"In most Title VII retaliation cases, the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiff's protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). That certainly is the case here with regard to the ultimate decision maker, Warden Timmerman-Cooper. There is no dispute that she received the letter of complaint.

Lt. Richardson, however, denies that she knew that Plaintiffs were the individuals who filed a complaint against her before the alleged adverse actions occurred. Plaintiffs have no direct evidence with regard to Lt. Richardson; however, "direct evidence of such knowledge or awareness is not required, and, [instead], a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element of her claim." *Id.*

Here, Plaintiffs have set forth evidence that the investigation of the letter of complaint was the "talk of the institution." (Kelley Dep. at 10.) Even though the warden had not informed any third shift employees of the complaint, Captain Robert Morris, Richardson's supervisor on

third shift, admitted that he heard about the letter submitted by the women "through the grapevine."  (Morris Dep. at 37.) Warden Timmerman-Cooper testified that corrections officers Tim Caudy and Peggy Powell telephoned her office to offer information contrary to the allegations in the letter *before* Mason was even instructed to begin the investigation by the warden.  After the warden assigned the investigation to Mason, an email was sent to all of the third shift employees informing them that Mason would be interviewing them.  Mason interviewed 55 of the 63 third shift employees.  During the interviews, individuals were told about the complaints the women had made about Lt. Richardson.

Further, Mason contacted Lt. Richardson at the beginning of the investigation informing her that their had been a complaint filed against her and that Mason was investigating it.  Mason informed Richardson that she would be interviewed at the end of the investigation.  While Richardson claims that she did know that Plaintiffs had filed the complaint about her, she did know that Bishop had just recently filed two incident reports about Richardson complaining of unfair treatment with regard to post schedules.

Finally, Bishop testified that on October 23, 2005, five days after the complaint, Richardson said to her:  "[T]here is a lot of stuff going on around here, don't get involved in it, remember you are on probation."  (Bishop Dep. at 123.)

Considering all of the evidence before it, assuming as true Plaintiffs' evidence and drawing all reasonable inferences in their favor of that party, the Court concludes that the evidence is sufficient to raise a genuine issue of material fact as to whether Lt. Richardson had knowledge of Plaintiffs' engagement in the protected activity.

**b. Prong 3 - Were Plaintiffs subjected to a retaliatory hostile work environment?**

Plaintiffs argue that after they complained to the warden about Lt. Richardson, they were subjected to increased glares and "dirty looks" from Richardson, that Gause was stationed outside in bad weather more often and was improperly stationed on a rooftop for a few hours, that male coworkers continued to make baby crying noises at them, that they once heard a male coworker scream "quit your bitching," that coworker Davis' "golden child" comments increased, and they felt ostracized by the male officers, *i.e.*, they felt they could only sit with and talk to other females.

The Court concludes that these minor changes to Plaintiffs' work environment considered with the ambient level of "hostility" that occurred before the protected activity, fall far short of actionable retaliatory hostile work environment. "[T]he level of seriousness to which th[e] harm must rise before it becomes actionable retaliation," means that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). The Supreme Court has explained:

> [W]e believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *see Faragher*, 524 U.S., at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' "). An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson* [*v. Shell Oil Co.*], 519 U.S. [337] 346 [(1997)]. It does so by prohibiting employer actions that

are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *See* 2 EEOC 1998 Manual § 8, p 8-13.

*Id.* at 68.

Plaintiffs' decision to report what they believed to be discriminatory behavior cannot immunize them from the petty slights, minor annoyances, personality conflicts, and snubbing by their coworkers that take place at LCI. Consequently, even when viewing the evidence in the light most favorable to Plaintiffs, they have failed to establish this element of their prima facie case of retaliation. However, this element can also be shown by adverse employment action.

### c. Prong 3 - Did Plaintiffs suffer adverse employment actions?

There is no dispute that Bishop and Henry suffered an adverse employment action when they were terminated. Marsh does not argue that her lateral transfer was an adverse employment action and the Court need not determine if it constitutes such because, as discussed below, Marsh cannot meet the causal connection element of her prima facie case.

With regard to Plaintiff Gause, she argues that after she accepted the requested demotion to the HIT position, the hostile work environment continued until she felt that the working conditions were intolerable, which caused her to take disability leave. Gause contends that the disability retirement was actually a constructive discharge. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citation omitted).

Gause testified that on her first day in the HIT position, Deputy Warden of Special Services Curtis Wingard called her into his office and in a short conversation informed her that she "wasn't escaping anything, that … he had knowledge of what was going on, and that basically he would be watching me." (Gause Dep. at 220). When Gause was chosen to be the assistant to her new supervisor, Karen Smith, Deputy Warden Wingard informed Smith that he believed she made a mistake and should have chosen Gause's coworker, Tina Wood. Smith believes that Deputy Warden Wingard and Wood were having an affair, which resulted in preferential treatment to Wood.

Gause also testified that Deputy Warden Wingard sent two emails to her superiors about her poor performance and that the emails were incorrect; however, when Wingard found out of his mistake he never sent out correction emails. Gause complains that Deputy Warden Wingard did not approve her request to volunteer in the reading room program, speculating that he denied her the opportunity to make her work time less comfortable or enjoyable. Finally, Gause testified that while Supervisor Smith was out of the office for a few weeks, Gause performed much of Smith's clerical work, which included dealing with purchase orders. However, Gause refused to sign the order when Deputy Warden Wingard told her to do so because Gause insisted that she did not have the authority to sign the documents. Gause called someone in the business office, who agreed with Gause that she should not sign the documents, but should send them to another designated individual. When Gause informed Deputy Warden Wingard of this, Gause claims that Wingard was furious and made her cry, which then caused her embarrassment. After the signature incident, Gause decided she could no longer work at LCI and took disability retirement.

Gause argues that she felt that if she stayed Deputy Warden Wingard was going to try to "put on me serious stuff, falsifying documents, you know depriving inmates of care, you know, it wasn't a step. It was removal and I knew that was what was going on." *Id.* at 253. In other words, Gause believed that her termination was imminent. While an employee can be considered constructively discharged when she reasonably believed her termination or demotion was imminent, *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002), no reasonable person in Gause's position could have believed that her termination was imminent based on the evidence before this Court, especially considering the continued performance praise that Gause received while working as an HIT.

That is, during Gause's time in the HIT position, she was praised continuously for her good work beyond having been named as "employee of the month." Deputy Warden Wingard spoke positively to Warden Timmerman-Cooper about Gause's attention to detail and the computer filing system for tracking records that Gause created. Deputy Warden Wingard testified that he believed Gause was an asset to the health services department, and based on her performance, he was glad to have Gause on his team. Additionally, Smith gave Gause an excellent performance review, which Deputy Warden Wingard reviewed and commented, "Cheri has come a long way. Serene personality, pays attention to detail, organized and content with doing thing (*sic*) the right way." (Wingard Dep., Ex. 18). Warden Timmerman-Cooper commented, "Ms. Gause does an excellent job in medical and very good at ACA doc. Thanks for doing a great job." *Id.* Major Kelley recalls that while Gause was an HIT, he heard positive comments from Warden Timmerman-Cooper about the great job Gause did to help the institution get ready for its audit.

Based on the foregoing, the Court concludes that, even when viewing all of the evidence in the light most favorable to Plaintiffs, Gause has raised no genuine issue of material fact as to whether she was constructively discharged.  No reasonable person in her position would have felt compelled to retire because of her working conditions.  Therefore, Gause cannot establish the third prong of her prima facie case of retaliation.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment on Gause's retaliation claim.

### d. Prong 4 - Was there a causal connection between Plaintiffs' protected activity and the adverse employment actions?

The remaining three plaintiffs must now satisfy the fourth element of their prima facie case, *i.e.*, showing that the adverse employment actions they suffered were causally connected to the complaint they filed against Lt. Richardson.

With regard to Marsh, Plaintiffs argue that Marsh's transfer to another correctional facility was an adverse employment action that was causally connected to the harassment and disparate treatment she received after she complained to the warden about Lt. Richardson. Setting aside for the moment whether this transfer constitutes an adverse employment action in this context, the Court concludes that the transfer could not have been caused by the treatment Marsh received after she filed the complaint.  Marsh requested the transfer in June 2005, four months before she engaged in any protected activity, and does not deny she would have accepted such a transfer if then offered.  Therefore, the transfer simply could not have been causally connected to any of Defendant's purported retaliatory actions.  Consequently, Marsh cannot establish her prima facie case of retaliation and, therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment on that claim.

Turning to Bishop and Henry, they were both terminated on December 12, 2005, close to

the end their one year probationary period. These two plaintiffs testified that after the warden received the letter of complaint about Lt. Richardson on October 17, 2005, Lt. Richardson increased her hostile glares and her hostile looks seemed even more hateful. Bishop and Henry contend that they were disciplined and ultimately terminated in retaliation for sending the complaint letter. Defendant asserts that Bishop and Henry were terminated because of their performance during their probationary period, not because of their protected activity.

The evidence before the Court indicates that probationary corrections officers were subject to written performance evaluations every 60 days. A lieutenant, who may or may not solicit input from other lieutenants, rates the employee. The evaluation is then reviewed by a captain, who endorses it if he is in agreement with it. The first two month evaluation typically rates only whether an employee came to work, since probationary employees spend the first two months in some type of training. By the four month evaluation, a supervisor has the opportunity to observe the probationary officer. Subsequent evaluations become increasingly meaningful and as the employee progresses through the first year of probation his or her skills are expected to improve.

With regard to Bishop, she received "meets" ratings in all categories on her first three evaluations. Lt. Richardson took over Bishop's evaluations at the eight month evaluation, on which she rated Bishop as "meets" in all categories and noted that Bishop had not missed any work since she started at LCI. Lt. Richardson and Captain Hampton signed the evaluation on October 15, 2005 and Bishop signed it on October 17, 2005.

On October 22, 2005, Bishop submitted to the warden two incident reports about Lt. Richardson relating to posts to which Bishop had been assigned within the month of October

2005.  Specifically, on October 10, 2005, Lt. Richardson moved Bishop to a less desirable post to replace an officer who was going home early.  Bishop perceived Richardson's action as harassment.  On October 17, 2005, Bishop was again removed to a less desirable post, this time from the control center, and complained that Richardson"felt I couldn't handle the post," and that it was "embarrassing to be treated as if I am NOT capable of working a post in front of my coworkers…."  (Timmerman-Cooper Dep., Ex. P) (emphasis in original).  Bishop stated in the report that she wanted to work the control center to "be left in there to learn it like the male officers are."  *Id.*  On October 24, 2005, Warden Timmerman-Cooper sent copies of the incident reports to Lt. Richardson and to Ernest Mack, Equal Employment Opportunity Chair, for investigation and to go along with the "other packet."  (Timmerman-Cooper Dep. at 78-81, Exs. O, P).

On October 23, 2005, Bishop testified that Lt. Richardson said to her that "there is a lot of stuff going on around here, don't get involved in it, remember you are on probation."  (Bishop Dep. at 123.)  Henry testified that Lt. Richardson reminded her a couple of times that she was on probation.

On October 27, 2005, Bishop received discipline for an incident that occurred on September 11, 2005, when Bishop was assigned to a "constant watch" post.  During constant watch a corrections officer is required to constantly observe an inmate who is on suicide watch through a cell door window in the medical treatment building and write down reports of the inmate's actions within no more than 15 minutes of the last report, but at sporadic intervals.  Bishop failed to write reports within the 15 minute time frame.  Lieutenant O. Barney conducted the fact-finding investigation of the discipline and recommended to the warden that no further

action be taken beyond his counseling of Bishop.  Warden Timmerman-Cooper denied the

recommendation, and Bishop was given a written reprimand.  The warden testified that "suicide

watches are extremely important to make sure the documentation is done appropriately . . .

because that's the life of the inmate.  That's why she got the written."  (Timmerman-Cooper

Dep. at 135).  On November 4, 2005, Bishop was informed that her probationary period was

going to be extended.

On November 20, 2005, Richardson completed the 10 month written performance

evaluation of Bishop.  On this evaluation, Bishop received two "below" ratings in "cooperation"

and "communication," with an overall rating of satisfactory.  (Bishop Dep., Ex. S). Lt.

Richardson commented:

> Officer Bishop has not effectively communicated with her supervisors this
> reporting period.  Officer Bishop has lacked communication with her supervisors
> on several occasions.  Incident reports were written by Officer Bishop concerning
> her job performance and job assignments before these incidents were discussed or
> resolved with her supervisors.  I expect Officer Bishop to use good judgment on
> every situation and not blindly follow a suggestion.

*Id.*  Lt. Richardson testified that the incident reports to which she referred were the two sent to

her by the warden that had been submitted by Bishop regarding Bishop's complaints about

harassment and shift assignments.  The LCI policy is that an employee may file the incident

report directly to the warden; however, Warden Timmerman-Cooper testified that the preferred

method is to first take complaints to the immediate supervisor.

With regard to Henry, she too received "meets" ratings in all categories on her first three

evaluations.  Lt. Richardson also began rating Henry at the eight month evaluation.  Richardson

rated Henry as "meets" and noted that Henry continued to adjust to the correction setting and

needed to ask more questions.  Lt. Richardson and Captain Hampton signed the evaluation on

October 16, 2005 and Henry signed it on October 17, 2005.

After October 17, 2005, the date the complaint letter was received by the warden, Henry testified that she began having problems with Lieutenant Joy. On November 14, 2005, Lt. Joy and another corrections officer, Timothy Caudy, observed Henry performing a count of the inmates because Caudy had reported that Henry was performing the count incorrectly. During the observation, Henry miscounted twice. Henry contends that Lt. Joy's continued interruptions caused her to miscount twice. Lt. Joy testified that he directed Henry to use a pen and paper and Henry refused to do so, claiming that it was not a required procedure. Henry contacted a union steward about the incident and claims that she was told to log the incident in the log book. Henry also composed an incident report the following day.

On November 19, 2005, Lt. Joy confronted Henry about her written comments in the log book. Lt. Joy testified that he heard that Henry was telling her coworkers that Joy harassed her and that she put this information, which he believed was untruthful, in the log book. The meeting turned into a yelling match and both Henry and Joy wrote incident reports about it. The warden ordered an investigation of the incident, which resulted in a report that concluded that Lt. Joy had engaged Henry in a shouting match in front of another corrections officer, that Henry had miscounted previously and the prior month had been instructed on how to properly count, that Henry miscounted during Lt. Joy's observation, and that Henry's comments in the log book were derogative toward Joy. The investigator recommended that further action be taken against Henry as well as against Lt. Joy. Warden Timmerman-Cooper disciplined both Henry and Joy for the incident.

On November 20, 2005, the same day Bishop's evaluation was signed, Lt. Richardson

prepared the ten-month written performance evaluation for Henry.  On this evaluation, Henry, like Bishop, received two "below" ratings in "cooperation" and "communication" with an overall rating of "satisfactory."  On the evaluation Richardson commented:

> Officer Henry has not effectively communicated with her supervisors this reporting period.  I expect Officer Henry to listen to her supervisors and to use good judgment on every situation and not blindly follow a suggestion of others. Institutional procedures need to be adhered to and realize that constructive criticism is a tool that is used to make her a better correctional officer.

(Henry Dep., Ex. JJ).  Lt. Richardson and Captain Hampton signed the evaluation on November 20, 2005 and Henry signed it on December 5, 2005.  Henry recalls that Lt. Richardson informed her that the "below" ratings for cooperation and communication were a result of the incident report that Henry filed.  Henry thought that Richardson was referring to the letter sent to the warden.  Lt. Richardson believes that she was referring to the incident reports Henry and Lt. Joy filed relating to the count incidents.

After the November 20, 2005 evaluations, the warden considered whether to terminate Bishop and Henry.  The warden does not recall why she reviewed Bishop and Henry at this time. The usual practice at LCI was that a lieutenant who was concerned about below average performance in a probationary employee would bring it to the warden's attention.  Her usual procedure was to hold a meeting with her deputy wardens, administrative assistant, labor relations officer, and major to obtain a verbal recommendation from the group as a result of a collective assessment of the employee's performance.  The warden would then make the final decision on whether to terminate the employee.

On December 12, 2005, Warden Timmerman-Cooper terminated Bishop and Henry. Henry was classified as a "no rehire."  (Timmerman-Cooper Dep. at 111-12, Ex. 43.)  Henry

testified that the warden informed Henry that she was being terminated for her inability to fulfill her job duties and that she would not be rehired by ODRC.  The warden testified that this meant that she did not believe Henry was the type of individual who could "make it in a correctional facility," but pointed out that Henry could obtain other state employment.  *Id.* at 112.  Bishop was not classified as a "no rehire."

Plaintiffs argue that the evidence is sufficient to raise jury issue as to whether their complaint letter caused their termination, particularly because of the close temporal proximity between the termination and the protected activity.  Temporal proximity alone is usually not enough to show causation.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986).  Unless immediate, temporal proximity must be "coupled with other indicia of retaliatory conduct" to give rise to a causal inference.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588-89 85 (6th Cir. 2009).

Here, assuming as true Plaintiffs' evidence and drawing all reasonable inferences in their favor of that party, the evidence indicates that within a few days of the warden receiving the letter of complaint, Lt. Richardson slightly increased her glares at Bishop and Henry, which they perceived as harassing, and made the comment to Bishop that "there is a lot of stuff going on around here, don't get involved in it, remember you are on probation."   (Bishop Dep. at 123.) Lt. Richardson also reminded Ms. Henry she was on probation "a couple of times."  (Henry Dep. at 161.)  Two weeks after the complaint, Bishop's probationary status was extended, one month after the complaint Bishop and Henry both received performance evaluations that were lower than their first four evaluations, and two months after the complaint they were both terminated. Although it is certainly a close call, the Court concludes that when viewing the evidence in the

light most favorable to Bishop and Henry, these two plaintiffs have raised a genuine issue of material fact as to whether they were terminated in retaliation for their protected activity.  In making this determination the Court recognizes the instruction from the Sixth Circuit as to the quantum of proof required to demonstrate a causal connection sufficient to establish a prima facie case of retaliation:

> The . . . burden to establish a prima facie case of retaliation "is not onerous." Indeed, it "is a burden easily met."  Further, to establish the element of causal link a plaintiff is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.' " Accordingly, at the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 565-66 (6th Cir. 2000) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)) (internal citations omitted).

### 2.  Legitimate nonretaliatory reason

Defendant argues that even if Plaintiffs Bishop and Henry establish their prima facie case of retaliation, it is still entitled to summary judgment because it had a legitimate nonretaliatory reason for terminating them that they cannot show to be pretextual.  That is, these two plaintiffs received discipline and low performance evaluations while they were probationary employees. These reasons easily meet Defendant's burden of production.  *See Burdine*, 450 U.S. at 254-56.

### 3.  Pretext

Because Defendant has produced a legitimate nonretaliatory reason for terminating Plaintiffs Bishop and Henry, to survive summary judgment these two "plaintiff[s] must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (affirming

district court's grant of directed verdict because the plaintiff presented no evidence to challenge credibility of employer's reason for termination) (citation omitted). "To make a submissible case on the credibility of his employer's explanation, the plaintiff is 'required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge.' " *Id.* at 1084 (emphasis in original) (citation omitted).

### a. Did the proffered reason for Plaintiffs' termination have a basis in fact?

"The first type of showing [of pretext] is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.' " *Id.* Here, it does not appear that Plaintiffs are attempting to make this type of showing, nor could they. That is, the evidence indicates that the proffered bases for the discharges of Bishop and Henry did in fact happen. Bishop and Henry both received low performance evaluations and were both disciplined for incidents that they admit happened. Warden Timmerman-Cooper relied upon those evaluations, disciplines, and the opinion of her circle of supervisory advisors in her decision to terminate Bishop and Henry.

### b. Were the proffered reason for Plaintiffs' termination sufficient to motivate Defendant to terminate them?

Similar to the first showing, the third way to show pretext "is also easily recognizable and, ordinarily, consists of evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. In the instant action, only Plaintiff Bishop argues that Defendant's proffered reason for terminating her was insufficient to motivate her discharge because her coworkers engaged in substantially identical conduct and were not

disciplined for it.

Specifically, with regard to her discipline for making a record-keeping error when observing an inmate on suicide watch, Bishop testified that a male coworker told her that he had committed an error of the same type on a suicide watch and was not disciplined for it. As to Bishop's discipline for being late to an in-service meeting, she testified that she was told by a male corrections officer that he had missed an entire in-service meeting and was not disciplined for it. Leaving aside the issue of whether the conduct engaged in by Bishop's coworkers was substantially identical, the evidence presented is hearsay and simply cannot be considered in ruling on a motion for summary judgment. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (hearsay evidence must be disregarded) (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). Plaintiffs present no other evidence to support their claim that Bishop was treated less favorably than similarly situated coworkers.

Consequently, Plaintiffs failed to show that Defendant's proffered reasons for their terminations were insufficient to motivate Defendant to discharge them.

### c. Did the proffered reasons for Plaintiffs' terminations actually motivate Defendant to discharge them?

Unlike the first and second manners available to demonstrate whether a defendant's proffered reason for terminating an employee is pretext, the second showing "is of an entirely different ilk." *Manzer*, 29 F.3d at 1084.

> [In this second showing], the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the

circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

If the bare bones elements of a plaintiff's prima facie case were sufficient to make this showing, however, the entire "burden shifting" analysis of *McDonnell Douglas* and its successors would be illusory. No case could ever be culled out after the prima facie stage and every case would have to be determined by a jury. We do not believe that this was the intent of Congress or the outcome envisioned by the Supreme Court in its long line of cases implementing employment discrimination legislation. Accordingly, we hold that, in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of [retaliation].

*Id.*

In the instant action, Bishop and Henry argue that, while discipline and low performance evaluations during an employee's probationary period may be sufficient reason to terminate them, retaliation was more likely than not Defendant's real motivation. Plaintiffs first argue that "[t]he timing sequence, disparate treatment, tolerated harassment, and vengeful reaction of Richardson" is precisely the type of evidence necessary to show Defendant's retaliatory motivation for terminating Bishop and Henry. (Doc. # 46 at 56-57 of 85.) Plaintiffs also assert that Warden Timmerman-Cooper's and Lt. Richardson's retaliatory motivation can be shown by the fact that they were disciplined more severely than were their coworkers who committed similar misconduct. All of this evidence, however, is part of the "bare bones elements of [Plaintiffs'] prima facie case" and is not "sufficient to make this showing" of pretext. *Manzer*, 29 F.3d at 1084. To make this type of rebuttal showing, Plaintiffs may not rely simply upon their prima facie evidence but must, instead, introduce additional evidence of retaliation. *See id.*

As to this additional evidence of retaliatory motivation, Plaintiffs point out what they perceive to be discrepancies in the stated reasons for Bishop's and Henry's terminations. That is, the termination letters sent to Bishop and Henry are identical and state: "You are being

31

probatory (sic) removed because you are unable to perform your job duties based on your performance evaluations." (Timmerman-Cooper Dep. at 41-42.) Warden Timmerman-Cooper also submitted affidavits relating to these discharges to the Ohio Civil Rights Commission in which she refers to Bishop's removal being caused by three disciplines in a four month period. Based upon this evidence, Plaintiffs make a tenuous argument regarding whether the phrase "performance evaluations" includes discipline or whether the warden is lying about the reasons for Bishop's terminations: "The Warden states that Bishop was terminated either because of discipline (in which case her termination letter gives a false reason for termination) or because of discipline that factored into her performance reviews." *Id.* at 127. Plaintiffs theorize that the reason why Warden Timmerman-Cooper did not specify each specific reason for her decision to terminate Bishop and Henry, her explanation for their termination is more likely a cover up for retaliation.

The Court, however, does not find it suspicious that Warden Timmerman-Cooper did not specifically state that "performance evaluations" included consideration of disciplinary actions and/or other forms of performance evaluations. Nor does the Court find these facts supportive of the conspiracy theory offered by Plaintiffs as to why Warden Timmerman-Cooper was not as detailed in their letters of termination that they believe she should have been. The uncontroverted evidence shows that the warden considered these two plaintiffs' disciplinary history, their lowered performance ratings, their probationary status, and the verbal recommendation of her circle of supervisory advisors, before making her decision to discharge Bishop and Henry. Further, all parties agree that counting inmates, for which Henry was disciplined for inaccuracy, is one of the most important duties a corrections officer performs.

With regard to one of the disciplinary actions taken against Bishop, the warden testified that "suicide watches are extremely important to make sure the documentation is done appropriately . . . because that's the life of the inmate." (Timmerman-Cooper Dep. at 135).

Finally, based on this evidence, the warden testified that she was left with concern about these two plaintiffs' fitness to pass from probationary employees to fully tenured corrections officers, especially Henry because of her insubordination towards her superior Lt. Joy. It was only then that Warden Timmerman-Cooper made the decision to terminate Bishop and Henry and to catagorize Henry as a "no rehire." Nothing here indicates that the warden's true motivation was retaliation and nothing here indicates that it was "more likely than not" that her explanation is a pretext or a coverup.

With regard to Lt. Richardson, Plaintiffs claim that she was motivated by retaliatory animus when she gave Bishop and Henry low marks on their 10 month evaluations and that these evaluations were part of the reason that they were terminated. Plaintiffs argue that because Lt. Richardson influenced Warden Timmerman-Cooper, the ultimate decisionmaker, Defendant is liable for Richardson's bias. *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir. 2001) (an employee challenges his termination as improperly motivated by a supervisor's discriminatory animus and then seeks to impute that animus to the neutral decisionmaker who ultimately terminated the employee). Lt. Richardson denies that her motivation for giving Bishop and Henry low marks on their evaluations was in retaliation for their complaint against her; however, Defendant argues that even if Plaintiffs could show that retaliation was Richardson's motivation, Plaintiffs would still be unable to demonstrate pretext. Defendant contends that because the warden conducted her own independent inquiry, the causal chain is

broken, and Richardson's bias would no longer be attributable to Warden Timmerman-Cooper. Defendant's argument is well taken.

The Sixth Circuit has recognized, in the prima facie case context, an employee may challenge her termination as improperly motivated by a supervisor's retaliatory animus and then seeks to impute that animus to the neutral decisionmaker who ultimately terminated the employee.  *See id.*; *see also Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992) (the plaintiff must offer evidence that the supervisor's animus was the cause of the termination or somehow influenced the ultimate decisionmaker).  Courts refer to this concept as the "cat's paw" theory, because the neutral decisionmaker "acted as the conduit of [the manager's] prejudice -- his cat's paw -- [thus] the innocence of [the neutral decisionmaker] would not spare the company from liability."  *Christian*, 252 F.3d at 877 (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)).  "Of course, if the [neutral decisionmaker] 'was not a mere rubber stamp, but made an independent decision to fire [the employee],' the court noted that there would be no basis for finding" employer liability.  *Id.*

The evidence before the Court shows that Warden Timmerman-Cooper engaged in an independent investigation and did not simply rubber stamp Lt. Richardson's evaluation these two plaintiffs' performance.  That evidence is uncontroverted.  Consequently, Richardson's retaliatory animus simply cannot be imputed to Warden Timmerman-Cooper.

Based on the foregoing, the Court concludes that even when viewing the evidence in the light most favorable to Plaintiffs, the evidence is not sufficient to permit a reasonable juror to reject Defendant's proffered explanations for discharging Bishop and Henry as a pretext, or coverup, for retaliation.  *See Manzer*, 29 F.3d at 1084.  Accordingly, the Court **GRANTS**

Defendant's Motion for Summary Judgment as it relates to Bishop's and Henry's retaliation claims.

## IV.  Conclusion

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment.  (Doc. # 45.)  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE